# First National Bank of Allegheny, Appt., *v.* Farmers' Deposit National Bank of Pittsburgh et al.

As a general rule the death of a partner dissolves the firm.

Nothing but the clearest and most unambiguous language, demonstrating in the most positive manner, by contract or by will, the intention of the decedent to make his general assets liable for debts contracted in continuing trade after his death, will render his estate a partner.

The fact that executors have left to one of their number, who is a surviving partner of the testator, the entire management of the estate, and he retains in the firm (without authority) the capital of the testator, will not give him a right to pledge securities of the estate for a loan to the firm.

In such a case the pledgee may be subrogated to whatever rights the pledgeor has as *cestui que trust* or legatee in the securities pledged.

NOTE.—For the liability of the estate of a deceased partner, see Watterson v. Patrick, 1 Sad. Rep. 262.

A change of property from executor to trustee, where both are the same person, may be shown by any authoritative and notorious act; but the mere determination of the executor in his own mind to hold as trustee instead of executor, is not such a setting apart for a trust as will relieve him from liability as executor and charge him as trustee.

(Decided November 15, 1886.)

Argued November 5, 1886, before GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ. October Term, 1886, No. 180, W. D. Certiorari sur appeal from a decree of Common Pleas No. 2 of Allegheny County for the defendants in a bill in equity. Affirmed.

This was a bill filed by the First National Bank of Allegheny against the Farmers' Deposit National Bank of Pittsburgh, Thomas H. Given, cashier of the bank, defendant, James Marshall, Jr., Thomas M. Marshall, Mark W. Watson and Matilda Marshall, executors of James Marshall, Sr., deceased.

The bill alleged in substance that James Marshall, Sr., died September 9, 1869, leaving a will, by which he provided, *inter alia,* as follows:

"*First.* I do hereby appoint my wife, Matilda, my son, James, my son-in-law, Mark W. Watson, and my brother, Thomas M. Marshall, executors of this will, and also trustees, as hereinafter provided for.

"*Second.* I bequeath to my executors the sum of $6,000 for the use and benefit of my niece, Jane P. Rainbow, to be paid to her at their discretion or by investing it for her benefit.

"*Third.* I devise and bequeath to my wife, Matilda, the house we now occupy as a home during her life, and $4,000 per year, together with furniture and the necessary appendages for her support and that of her minor child, Anna Frances; this is to be in lieu of my wife's dower.

"*Fourth.* I bequeath to my executors all the balance of my estate, real, personal, and mixed, to have and to hold the same in trust for the use and benefit of my children, *viz.:* Harriet Watson, James, Julia, and Anna Frances, making them all equal at twenty-one years of age, share and share alike; and should any of them die without lawful issue their interest shall be equally distributed to the survivors or the heirs of my deceased children by investing it for their benefit or paying to them the proceeds,

as I wish them, the executors, to be invested with full power to give or withhold as they think best for the interest of any or all my children; and for the purpose of carrying out this my purpose I hereby authorize my executors to purchase and sell real estate at public or private sale, as they deem for the best interests of my children, and to hold it in trust for them, or give it to them as they regard their best interest."

The bill alleged also that on April 1, 1874, Thomas M. Marshall, Mark W. Watson, and Matilda Marshall executed a letter of attorney which began with a recital of their appointment as executors and concluded thus:

"Know All Men by These Presents, That we have authorized James Marshall, Jr., and in behalf of the estate of James Marshall, deceased, to vote all the stock owned by said estate at the elections of the various corporations in which said stock is entitled to be voted; to make all necessary leases and re-leases in regard to the real estate pertaining to said estate; to make and execute all necessary bills, drafts, or acceptances which pertain to the business of the estate, and to assign, transfer, and hypothecate gas, water, or any other stock belonging to the estate, as security for any loan necessary to the purposes of the estate, and to do and perform all other necessary business of the estate for us, and in our names; to execute and perform as largely and as amply as we ourselves might or could do if personally present, hereby ratifying and confirming as good and effectual in law and equity all that the said James Marshall, Jr., shall lawfully do by virtue thereof."

The sixth, seventh, and eighth paragraphs of the bill alleged that James Marshall, Jr., as acting executor, borrowed for the purposes of the estate from the plaintiff on December 27, 1878, $8,000; on October 30, 1879, $13,500; and on April 1, 1878, $4,000, gave his note as acting executor and gave as security stock of the defendant bank belonging to the estate; that the notes had been renewed from time to time; and that all the loans were unpaid except the loan of $13,500, and on that a balance of $12,000 was still due.

The subsequent paragraphs of the bill alleged that the certificates of bank stock were delivered to the plaintiff with assignments indorsed thereon and a power of attorney to transfer the same on the books of the bank; that, by the terms of the notes, the plaintiff was authorized to sell the stock; that the defend-

ants, the bank and Thomas H. Given, its cashier, refused to permit a transfer of the stock; that the stock could not be sold for its full value, until such transfer had been made; that the stock has no fixed market value.

The bill prayed that the defendant bank and its cashier should be restrained from preventing the transfer of the stock on the books of the bank and be ordered to issue certificates to the plaintiff; that the other defendants should be restrained from transferring the stock to any other person than the plaintiff, and from interfering with the transfer to the plaintiff; and that the plaintiff should be authorized to sell the stock at public or private sale, and apply the proceeds to the payment of the notes and necessary expenses and charges.

The answer of the defendant bank and its cashier were merely formal.

The answers of the other defendants denied the allegations of the sixth, seventh, and eighth paragraphs of the bill and alleged that the money borrowed by James Marshall, Jr., was used by him to pay an individual debt and for the purposes of the firm of James Marshall & Company, and that the plaintiff knew the fact when the loans were made.

The master, R. B. Carnahan, Esq., reported, *inter alia,* as follows:

"Stated broadly, there is but one question in the case, and that is, whether the moneys borrowed by James Marshall, Jr., from the plaintiff, on the notes and pledges of stock as stated in the sixth, seventh, and eighth paragraphs of the bill, were by him borrowed, and by the plaintiff bank lent and advanced to him, as executor for the purposes of the estate of James Marshall, deceased. It will be observed that the bill makes no statement of the particular purpose connected with the estate of James Marshall for which the loans and advances were made, as alleged—the phrase 'for the purposes of said estate,' being of general import. By 'estate' the master understands all the property, of every kind, which James Marshall left, and by his will placed in the hands of the executors and trustees for administration, management, and distribution or division to and among the legatees and devisees therein named. Moneys advanced 'for the purposes of said estate' include all advances made for purposes of administration and for the execution of the pow-

ers and trusts provided in the will.   It is in this sense that the phrase will be employed in this report, though the counsel for the plaintiff, in argument, appeared to attach to it a more extended signification."

The master then reviewed the testimony and continued:

"In the judgment of the master, the evidence in this case clearly proves that [the money borrowed by James Marshall, Jr., one of the executors of the will of James Marshall, deceased, from the First National Bank of Allegheny, on the three several notes signed 'James Marshall, acting executor,' and payable to the First National Bank of Allegheny, of the dates and amounts set out in the sixth, seventh, and eighth paragraphs, and on the several certificates of stock pledged as security for the payment of said notes, also therein recited, were not, nor was any part of the same, borrowed by said James Marshall, nor were said moneys, or any part thereof, lent and advanced to said James Marshall by the plaintiff bank for any purpose of administration of the estate of James Marshall, deceased, nor for any purpose connected with the performance of any duty or trust, or the execution of any power which the will of said James Marshall had devolved upon the executors thereof, or the trustee under the same, and whether as executors or trustee; and that the plaintiff bank well knew that none of the money so borrowed, lent, and advanced, as aforesaid, was to be applied to any of these objects and purposes.]

"It also proves the certificates of stock originally pledged, as well as those subsequently substituted, were the property of and part of the assets of the estate of James Marshall, deceased, and that these facts were well known to the plaintiff bank at the time of the transactions recited in the paragraph of the bill above referred to, and that none of the executors of or trustees under the will of James Marshall, deceased, except James Marshall, Jr., had any knowledge of any of these transactions until after the maturity of the last renewals of the several notes.

"And the master accordingly so finds as a matter of fact.

"The evidence also proves that the money borrowed by James Marshall, Jr., one of the executors, from the First National Bank of Allegheny, on the notes signed by him as acting executor, and the stock securities referred to in the sixth, seventh, and eighth paragraphs of the bill, was so borrowed by him, and were lent and advanced by the plaintiff bank to him, for the purposes and benefit of James Marshall & Company.

"It is true that a part of the proceeds of the note for $8,000, discounted by the bank on the 27th of December, 1878, was applied to the payment of the individual note of James Marshall, Jr., for $4,500, then held by the bank and not then due, under an arrangement with the president of the bank that a portion of the proceeds should be so applied; but Mr. Marshall is uncertain whether his individual note was not made and discounted by the plaintiff bank for James Marshall & Company, and he thinks that he told the officers of the bank that James Marshall & Company got the proceeds of the discount of that note.

"It is beyond doubt that the note for $8,000 was discounted for either James Marshall, Jr., individually, or James Marshall & Company, or for both; but the weight of the evidence is that the discount was made for James Marshall & Company, it appearing that the discounts on the various renewals of this note, as well as the discount on the renewals of the other two notes, for $13,500 and $4,000 were invariably paid by the checks of James Marshall & Company.   In the judgment of the master, the evidence clearly shows that each one of these notes recited in the sixth paragraph, and seventh and eighth paragraphs of the bill, were originally discounted by the bank for, and were subsequently renewed for, and ·for the benefit and purposes of, James Marshall & Company, and for no other purpose whatever; but [the evidence just as clearly proves that the notes were originally discounted by the bank, through its president, T. H. Nevin, Esq., and subsequently renewed for James Marshall & Company, under a belief that the estate of James Marshall, deceased, was embarked with James Marshall, Jr., in business under the firm name of James Marshall & Company, the estate holding and owning an interest in the business to the extent of three fourths; and that that belief strengthened by the statements of James Marshall, Jr., to Mr. Nevin, the president of the bank, and to others, was the principal, if not the only, inducement operating on the mind of Mr. Nevin in making the discount.]

"Indeed, the evidence goes far in the direction of proving that the other notes discounted for James Marshall & Company, prior to the offering and discounting of any of the paper made by James Marshall as acting executor, to wit: the first day of April, 1878, were discounted by the plaintiff bank under the same impression and belief that the 'estate was in the firm.'

And the master, accordingly, from all the evidence in the case, so finds as matter of fact, except as to the statement in the last preceding sentence.

"He finds, further, that the money lent and advanced by the plaintiff bank was used by James Marshall for the purposes of, and in and about the business carried on under the name of James Marshall & Company; and if the estate of James Marshall was interested with James Marshall, Jr., in a firm known by the name of James Marshall & ompany, at the time of the discount of the notes so often referred to, as a partner, then the estate did receive benefit from these discounts.

"A very important inquiry is, Was the estate of James Marshall, deceased, a partner with James Marshall, Jr., in a firm doing business under the name of James Marshall & Company at the time of the transactions referred to?

"The master has found in another part of this report that there were no written articles of copartnership between James Marshall, Sr., and James Marshall, Jr., which provided for a continuance of the interest of the testator in the firm of James Marshall & Company after his death, and that there were, in fact, no written articles of partnership between them at all.

"He further finds that there is no evidence in this case of any verbal agreement or understanding between the father and the son that the interest of the former should be continued in the partnership after his death, nor that his estate, represented by his executors or trustees, should be regarded after his death as a partner in the then existing firm, and he accordingly so finds, as matter of fact.

"He further finds, as matter of law and fact, that [there is no provision in the will of James Marshall, Sr., providing for the continuance of his interest in the firm of James Marshall & Company, or authorizing his executors or trustees to continue his interest, or to embark his estate in business under the name of James Marshall & Company, or under any other name or style whatever.]

"Clearly, then, the firm of James Marshall & Company was dissolved by the death of James Marshall, Sr., in September, 1869. Had the executors of his will, or the trustees named in it, power to form a new partnership with James Marshall, Jr., by which the estate of the testator could be again embarked in the firm or any business venture whatever?

"In Scholefield v. Eichelberger, 7 Pet. 586, 8 L. ed. 793, and Burwell v. Cawood, 2 How. 560, 11 L. ed. 385, this subject was fully considered by the Supreme Court of the United States, and in the latter case Judge STORY delivered the opinion of the court, saying on pages 576, 577, L. ed. p. 385:

" 'By the general rule of law every partnership is dissolved by the death of one of the partners.    It is true that it is competent for partners to provide by agreement for the continuance of the partnership after such death; but then it takes place in virtue of such agreement only as the act of the parties, and not by mere operation of law.    A partner, too, may by his will provide that the partnership shall continue, notwithstanding his death; and if it is consented to by the surviving partner, it becomes obligatory, just as it would if the testator, being a sole trader, had provided for the continuance of his trade by his executor after his death.    But then, in each case, the agreement or authority must be clearly made out, and third persons, having notice of the death, are bound to inquire how far the agreement or authority to continue it extends and what funds it binds, and if they trust the surviving party beyond the reach of such agreement, or authority, or fund, it is their own fault, and they have no right to complain that the law does not afford them any satisfactory redress.  .  .  .    And this leads us to remark that nothing but the most clear and unambiguous language, demonstrating in the most positive manner that the testator intends to make his general assets liable for all debts contracted in the continued trade after his death, and not merely to limit it to the funds embarked in that trade, would justify the court in arriving at such a conclusion.'

"The case of Smith v. Ayer, 101 U. S. 320, 25 L. ed. 955, decided in 1879, recognizes and approves the opinion of Judge STORY in Burwell v. Cawood, as a 'distinct statement' and sound exposition of the law on this subject.

"Undoubtedly there have been cases in Pennsylvania where executors and administrators have permitted testators' and intestates' surviving partners to carry on the firm business, and questions have arisen between them and distributees, devisees, and heirs as to credits allowed and surcharges sought to be made (Stern's Appeal, 95 Pa. 504); but the master has not had cited to him, nor has he been able to find any case in Pennsylvania in conflict with or which qualifies the doctrine of the Supreme Court of the United States in the cases above cited.

"Testimony was produced by the plaintiff, for the purpose of showing that Thomas M. Marshall, Mark W. Watson, and Matilda Marshall, three of the executors of and trustees under the will of James Marshall, deceased, had knowledge of the fact that James Marshall, Jr., was carrying on the business of James Marshall & Company with the assets of the estate, and had consented to and approved of such use of the property of the estate.

"They rely on the fact that James Marshall, Jr., carried on business under the name of James Marshall & Company, from the death of the testator, his then partner, in 1869, until 1883, apparently just as the business had been conducted in his father's lifetime, and that they had never required him, as surviving partner, to settle with them the business of the late firm; had not required, nor even asked him to render an account, etc.; and these facts are found by the master, in another part of this report, to be as claimed by the plaintiff bank.

"If the question were between the executors or trustees and the legatees and beneficiaries of the estate, or between the former and a creditor of the estate of the late James Marshall, this evidence would not be without weight; but the master is not able to draw from it any inference that three executors and trustees above named had placed the estate of the testator in the firm of James Marshall & Company, as a partner with James Marshall, Jr., the other executor and trustee.

"At most the evidence proves nothing beyond inattention to and carelessness in the management of the property of the estate; and the testimony of Thomas M. Marshall, Mark W. Watson, and Matilda Marshall, all shows that neither of them knew of, nor approved in any way or form of, the pretensions of James Marshall, Jr., to carry on business under the name of James Marshall & Company, with the assets of the estate.

"It appears that none of the executors ever examined the books of James Marshall & Company, nor has James Marshall, Jr., testified that any of his coexecutors and trustees was ever consulted by him respecting the business of James Marshall & Company, or that there was any agreement between them, verbal or written, or any consent given to the use of the property of the estate by him, in and about the business of James Marshall & Company.

"But it is claimed by the plaintiff bank that the three other executors, by the power of attorney made by them or the first

day of April, 1874, constituted James Marshall, Jr., their co-executor, acting executor, with power 'to make and execute all necessary bills, drafts, or acceptances which pertain to the business of the estate, and to assign, transfer, and hypothecate gas, water, or any other stock, belonging to the estate, as security for any loan necessary to the purposes of the estate, and to do and perform all other necessary business of the estate for them and in their names, to execute and perform as largely and as amply as they themselves might or could do if personally present, thereby ratifying and confirming as good and effectual in law and equity all that the said James Marshall, Jr., should do by virtue thereof.'

"It appears from the evidence that this power of attorney was given under the following circumstances:

"The executors and trustees had erected a new building on the lot of ground belonging to the estate at the corner of Liberty and Wood streets, in the city of Pittsburgh, and some debts had been contracted in making the improvement. It was deemed desirable to consolidate these debts in one loan, and an effort was made to raise $30,000 for that purpose, on a mortgage.

"The effort was unsuccessful, for some reason, but it was found that the money might be raised on a note secured by a hypothecation of stock of the estate, and a loan for that amount was effected, as stated in a preceding part of this report.

"Thomas M. Marshall and Mark W. Watson have both testified to this effect, the former also stating that one of the purposes was to authorize James Marshall, Jr., to vote and represent the stocks of the estate at corporation elections. Mrs. Matilda Marshall signed the power, as she states, because the other executors had done so.

"It is very questionable whether this instrument conferred on James Marshall, Jr., any power which he did not already have as executor.

"Coexecutors are regarded in law as an individual person, and the acts of any one of them in respect to the administration of the effects, are deemed to be the acts of all. Wood's Appeal, 92 Pa. 391, 37 Am. Rep. 694.

"Had this money been borrowed by James Marshall, Jr., for any purpose of administration, his power to hypothecate the stocks as security for the repayment of the loan, without the concurrence of his coexecutors, would have been unquestionable.

' "The money was borrowed for a purpose, not of administration, but of improvement of the estate.    If the executors or trustees were really authorized by the will of James Marshall, deceased, to make this improvement at all, they were so authorized in their character as trustees, as the building enterprise was management and improvement, rather than administration of the estate; and as trustees they could not delegate their power and discretion as such to one of their number.    Bohlen's Estate, 75 Pa. 304.

"A hypothecation of stocks by these executors, for the purpose of raising money to be lawfully expended by them as trustees, would have been a valid act, and would only show that their functions as executors and trustees were executed concurrently; but one executor could have made the hypothecation as well as the four united.    The hypothecation would have been good and valid, too, if the money had been raised for a purpose not within the scope of the powers of the executors and trustees, if the lender had no knowledge of the intended illegal application of the money loaned, and the loan had been made to one or more of the executors in their quality as executors.    It is difficult, therefore, to see that the instrument called a power of attorney operated to confer on James Marshall, Jr., a power or authority which he did not already have, or how it constituted him an acting executor.

"It was probably intended to exhibit to persons having business with the executors, in matters relating to the estate, the fact that James Marshall, Jr., was not acting in such matters without the knowledge and consent of his coexecutors and trustees; but if any power was granted, it was certainly limited by the instrument itself, 'to the business of the estate,' 'to the purposes of the estate,' 'to the necessary business of the estate.'    It certainly did not authorize James Marshall, Jr., to draw the whole or any part of the assets of the estate into a business which he was individually, or, as surviving partner, carrying on under the name of James Marshall & Company.

"Evidence was also given by the plaintiff bank to prove that Mark W. Watson, one of the executors and trustees, admitted to various persons that the estate of James Marshall was in the firm of Marshall & Company."

The master then reviewed the testimony on that point and continued:

"Alleged admissions of the kind above stated at brief inter-

views, without accuracy as to the time and circumstances, are an unsatisfactory kind of evidence, even when not denied under oath. Here the denial under oath is broad and positive, and the master cannot say that the alleged admissions have been proven. On the contrary, he finds that they have not been proven."

"It is also shown that James Marshall, Jr., kept books in the form of partnership books, and that profits to the extent of three fourths were credited to the estate as partner with him, and that losses, in the same proportion, were charged against the estate. But it is not shown by any testimony that the executors and trustees, other than James Marshall, Jr., himself, had any knowledge how the books were kept, much less that they, or any of them had ever seen or examined the books. The result of all the testimony on this subject, in the judgment of the master, is that the general management of the business of the estate was left by his coexecutors and trustees to James Marshall, Jr., and that he had assumed, without inquiry of his coexecutors, or of any other person, that the estate remained in the firm after the death of his father, without other change than that the personality of the father had disappeared from it.

"The master cannot do otherwise than find from the above testimony, and all the testimony in the case bearing on the subject, both as matter of fact and of law, that the estate was not in the firm at the times of the transactions mentioned in the sixth, seventh, and eighth paragraphs of the bill, nor before nor after those transactions.

"But it is claimed by the plaintiff that the estate of James Marshall was actually benefited by the loans and advances of money by it to James Marshall & Company."

Here the master reviewed the testimony on the point and resumed:

"The master, therefore, cannot find that the estate of James Marshall actually derived any benefit from the loans and advances made by the plaintiff bank to James Marshall & Company; but on the contrary [he does find, from all the evidence in this case, that the estate of James Marshall derived no benefit, direct or indirect, from said loans and advances.]

"The question, however, remains whether the foregoing findings constitute in law and equity a good defense to the plaintiff's claim to the stock as pledgee thereof.

"The law regards the executor as the owner of the personalty

of his testator, as respects title and power of disposition for the payment of debts, legacies, and expenses of administration. He may dispose of the personal assets by sale or pledge, for all purposes connected with the discharge of his duties under the will. And even where the sale or pledge is made for other purposes, of which the pledgee has no knowledge or notice, but takes the property in good faith, the transaction will be sustained; for the purchaser or pledgee is not bound to see to the disposition of the proceeds received. But the case is otherwise where the purchaser or pledgee has knowledge of the perversion of the property to other purposes than those of the estate, or the intended perversion of the proceeds. The executor, though holding the title to the personal assets, is not absolute owner of them. Smith v. Ayer, 101 U. S. 326, 327, 25 L. ed. 955. Where there are several executors, the act of one is as effectual in transferring title as if all had joined.

"It is otherwise in the case of trustees appointed by will for the management of the estate of a testator. Bohlen's Estate, 75 Pa. 312; Bayard v. Farmers' & M. Bank, 52 Pa. 236.

"One of the contentions of the defendants in this case is that the title to the stocks pledged had become vested in James Marshall, Jr., and cotrustees at the time of his transactions with the plaintiff bank, and that he consequently had no power, without the concurrence of his cotrustees, to make a pledge in the assumed character of executor or acting executor.

["The evidence proves that all of the debts of the testator had been paid before 1876.] There is also evidence that the four executors, soon after the death of James Marshall, had agreed between themselves that the Allegheny Gas & Farmers Deposit National Bank stocks should not be sold, but be reserved for distribution among the beneficiaries under the will. It is claimed that these facts (in connection with the long period of time that had elapsed since the death of the testator, and that there was nothing further for the executors to do) show that the functions of the executors had terminated before James Marshall, Jr.'s, dealings with the plaintiff bank in his quality as executor.

["The master is unable to see that the facts referred to, though fully proven, warrant the inference or conclusion which the defendants seek to draw from them.] The numerous cases

to which the attention of the master has been called, by counsel for the plaintiff, clearly show the law to be otherwise.

"The result of the authorities on the subject is stated with great distinctness in Perry on Trusts and Trustees, 3d ed. §§ 262, 263: 'If the same person is both executor and trustee, it is sometimes difficult to determine whether in a particular case he is acting as executor or trustee. In England the rule seems to be that if the executor assents to the legacy, if it is specific, or if part of the assets are clearly set apart and appropriated by him to answer a particular legacy, he will be considered to hold the fund as trustee for that trust, and not as executor. In jurisdictions where executors and trustees are required to qualify and give bonds, it has been held that an executor, who is also a trustee under the will, cannot be considered as holding any part of the assets as trustee, until he has settled his account at the probate office, as executor, and has been credited with the amount as executor, with which he is afterwards to be charged as trustee. In other cases it has been held that the change of property from the executor to the trustee, where they are the same persons, may be shown by some authoritative and notorious act; but that the mere determination of the executor in his own mind to hold certain particular property thereafter in trust for a particular legatee under the will, is not such a setting apart as to discharge him from his liability as executor and to charge him as trustee.'

"It is further said that 'after the lapse of twenty years the law will presume that the estate was fully administered, and that thereafter the executor held the funds as trustee. So . . . actual final settlement of the estate as executor, he will be presumed to hold subsequently as a trustee.' § 262.

"The executors of James Marshall's will had filed no account at the time of the dealings of James Marshall, Jr., with the plaintiff bank.

"The agreement to reserve certain stocks for distribution was not a setting apart by the executors for that purpose, much less was it evidenced by any authoritative or notorious act, such as actual transfers of the stocks to particular beneficiaries, or other appropriation in fact. Besides, the will of James Marshall and the evidence show that other acts as executors, relating to the distribution of the estate, remain to be performed. The master accordingly holds that the stocks in question had not passed to the trustees at the time of the transactions referred to, and the

question of the validity of the plaintiff's title to the stock must be determined on other grounds.

"Is the plaintiff bank a bona fide holder of the stock as pledged under the evidence and the facts as above found? The evidence leaves no doubt that the plaintiff, in fact, made the loans and advances to James Marshall, Jr., one of the executors on his notes signed 'acting executor,' and on the security of the stocks originally pledged by him for the payment of the notes in actual good faith and with the honest purpose and intention of benefiting the estate of James Marshall, and under the actual belief that said estate would be benefited thereby, nor that James Marshall, Jr., himself actually believed that 'the estate was in the firm.' Is this the good faith on the part of the pledgee which the law requires?

"In the case of Field v. Schieffelin, 7 Johns. Ch. 150, 11 Am. Dec. 441, cited by the plaintiff, Chancellor KENT concluded an extensive and very critical examination of the cases then decided as follows: 'I have thus looked pretty fully into the decisions in the analogous case of a purchase from an executor of the testator's assets, and they all agree in this, that the purchaser is safe if he is no party to any fraud in the executor, and has no knowledge or proof that the executor intended to misapply the proceeds, or was, in fact, by the very transaction, applying them to the extinguishing of his own private debt. The great difficulty has been to determine how far the purchaser dealt at his peril when he knew from the very face of the proceeding that the executor was applying the assets to his own private purposes, as the payment of his own debt. The latter and the better doctrine is, that in such a case he does buy at his peril; but that, if he has no such proof or knowledge, he is not bound to inquire into the state of the trust, because he has no means to support the inquiry, and he may safely repose on the general presumption that the executor is in the due exercise of his trust.'

"In Carter v. Manufacturers' Nat. Bank, 71 Me. 448, 36 Am. Rep. 338, also cited by the plaintiff, the facts were that an executor borrowed from the bank a sum of money, giving his own note, and transferring fifty shares of stock belonging to the estate which he represented, as collateral security for the loan, assigning and transferring the stock in his capacity as executor. It was admitted that the money was loaned in good faith by the bank, and upon the statement made by the executor that it was

wanted in the settlement of his testator's estate; the executor applied the money to his own uses, and it was held by the court that the pledge of the stocks was valid.

"On what ground? On no other than that the bank was not bound to pursue a fruitless inquiry. The will of the testator would not have informed the bank whether the money borrowed was needed for the purpose of payment of debts, or any purpose of administration, if it had been examined. There is no record ordinarily kept in any public office in which the debts of a testator are exhibited, nor could there be until they are finally ascertained by the settlement of the account of the executor. How could the bank know whether legacies had been paid until the estate had been settled? And why compel inquiry when inquiry must be fruitless?

"The court says: 'If the note had been given to the bank for a private debt due to the bank from the executor, created before or during his executorship, but independent thereof, it would come within the principle of the numerous cases before cited, where the transaction itself would speak and conclude the bank. But if given as a voucher for money obtained for a legitimate purpose connected with a bona fide administration of the will, then, though the executor alone was made liable for its payment, the transaction would be legitimate and the estate would have no reason for complaint. The case finds "that the money was loaned in good faith by the bank, and upon the statement made by Cook, that the same was wanted in the settlement of the estate." The presumption is that he was acting faithfully.'

"The court also says: 'It also now seems to be well settled in equity, at least, that an executor can make no valid sale or pledge of his testator's effects for the payment or security of his own private debt, . . . on the ground *res ipsa loquitur,* giving the purchaser, mortgagee, or pledgee such notice of the misapplication as necessarily to involve him in the breach of duty.'

"For this position, the court cites numerous authorities, one of which is Lowry v. Commercial & Farmers' Bank, Taney, 310, 330, Fed. Cas. No. 8,581, in which the late Chief Justice TANEY said: 'But it is equally clear that if a party dealing with an executor has, at the time, reasonable ground for believing that he intends to misapply the money, or is in the very transaction applying it to his own private use, the party so dealing is responsible to the persons injured.'

"To the same effect are all of the cases cited by the plaintiff, and the doctrine which they enunciate is the well-settled law, and they rest mainly on the basis that the purchaser is not bound to inquire where inquiry is not likely to result in knowledge, but is bound by the information which he actually has, or which the transaction necessarily gives him.

"There is another class of cases not inconsistent with those above referred to which go further, and hold, in substance, that whatever is sufficient to put a party on inquiry is deemed notice in equity; the law imputing to a purchaser the knowledge of the fact of which the exercise of common prudence and ordinary diligence must have apprised him.

"The case of Garrard v. Pittsburgh & C. R. Co. 29 Pa. 154, cited by the defendants, is to this effect, Judge Lewis, then Chief Justice, delivering the opinion of the court: 'A purchaser, with notice that the sale is a breach of trust or a fraud upon the rights of the real owner, is *particeps criminis* with the fraudulent vendor, and his purchase cannot protect him against the owner, because such a purchase is not bona fide. Notice is either actual or constructive. Constructive notice is in its nature no more than evidence of notice, the presumption of which is so violent that the court will not even allow of its being controverted. . . . Whatever is sufficient to put a party upon inquiry is in equity held to be good notice to bind him. Where a purchaser cannot make out a title, but by a deed which leads him to another fact, he shall be presumed to have knowledge of that fact. . . . So he is supposed to have knowledge of the instrument under which the party with whom he contracts as executor or trustee, or appointee, derives his power.'

"In Smith v. Ayer, 101 U. S. 327, 25 L. ed. 958, it is said that 'the executor, though holding the title to the personal assets, is not absolute owner of them. . . . He holds them in trust to pay the debts of the deceased, and then to discharge his legacies; and, as in all other cases of trust, he is personally responsible for any breach of duty. . . . The law exacts the most perfect good faith from all parties dealing with a trustee, respecting trust property. Whoever takes it for an object other than the general purposes of the trust, or such as may reasonably be supposed to be within its scope, must look to the authority of the trustee, or he will act at his peril.' And on page 328, L. ed.

959, 'In the cases at bar, the defendants Ayer & Co. and the directors of the bank knew that the pledging of the assets of the estate, of which Benjamin T. Renick was executor, to secure a loan for the business of a commercial house, was a misuse of them, unless, indeed, the will of his testator authorized it. The law imputed such knowledge to them. They could not say that such assets could be rightfully used as collateral security for loans to be employed in the business of a commercial house. It would be attributing to them the lack of ordinary good sense to suppose they entertained any such notion.'

"The doctrine of these cases is only a corollary of the doctrine of the cases cited by the plaintiff, for if a man is not bound to inquire because inquiry would be fruitless, it follows logically that it is his duty to inquire when inquiry will certainly result in knowledge.

"The plaintiff bank knew that James Marshall was deceased, and had left a will. The note offered to them by one of the executors and the certificates of stock produced, informed it of these facts, if it did not previously know them, and of the further fact that the stocks belonged to the estate of James Marshall, deceased. The application of the executor to the bank was for a loan of money for the firm of James Marshall & Company. The president of the bank [Mr. Nevin, knew, and through him the bank knew, that the money which the bank was asked to advance or loan was not to be used for any purpose of administration of James Marshall's estate, or for any purpose which might reasonably be supposed to be within the scope of the executors' powers under the will.]

["If the president or any officer of the bank had chosen to look at the record of the will in the office of the register of wills, he would have learned that the instrument gave no power to the executors or trustees or any other person or persons to embark the estate of the testator in the firm of James Marshall & Company. Inquiry, if made, of any of James Marshall, Jr.'s, coexecutors or cotrustees, would have led to the same result, and the bank was bound to know that without any provision in the will, giving authority to place the estate in the firm, to the executors or trustees, it could not be in the firm.]

"The law visited the bank with notice of this. [The application for the loan on the paper of one of the executors, and on the security of the assets of the estate, for the benefit of James

Marshall & Company, was an extraordinary one; and it is amazing that the bank made no inquiry whether a loan for such a purpose was authorized by the will.]

"The master is of opinion that [the bank was bound to make inquiry, being fully informed of the purposes for which the loan was asked; and on failure to inquire, where inquiry must have resulted in knowledge that the will of James Marshall did not authorize his executors, or any of them, to borrow money for such a purpose, that knowledge must be imputed to it, and the master so finds as matter of law.]

["The plaintiff has not, therefore, shown a valid title to the stock which it claims as pledgee.]

"But it is claimed by the counsel for the plaintiff bank that the coexecutors and trustees of James Marshall, Jr., cannot avoid the pledge of the stock, although the latter committed a breach of trust in making it, of which the former had no knowledge and are entirely innocent, and they cite as authorities for this doctrine: Schouler, Exrs. & Admrs. § 360; Stronach v. Stronach, 20 Wis. 129; Herron v. Marshall, 5 Humph. 443, 42 Am. Dec. 444; Hagthorp v. Neale, 7 Gill. & J. 13, 26 Am. Dec. 594, and other cases.

"It is well settled by the authorities that an executor or administrator, guilty of a breach of trust, in the sale or pledge of the assets of the estate, will not be permitted to set up his own illegal acts to vitiate his own contracts; which is nothing more than applying to persons in a representative capacity a rule of universal application to the individual. He must answer personally and on his bond (if one has been given) for his own delinquency; and his successor *de bonis non* cannot avoid his illegal acts; for it is not within the scope of his powers to review, correct, and avoid the maladministration of his predecessor, and he has no interest. Two or more executors or administrators are in law treated as one personality, but only as respects powers. The law does not impute the crime or other illegal act of one to his associate, nor is the innocent legal representative answerable, personally or on his bond, for the delinquency of his associate in the trust. This appears to the master to be the very test of the question whether he can avoid the breach of trust or other illegal act of the delinquent party.

"All the cases hold that the innocent beneficiaries under the will, and devisees, and legatees interested in the estate may avoid

the breach of trust, and [the master sees no reason in the authorities cited, and knows no rule or doctrine which would prevent the *cesluis que trustent* in this case from appearing by the innocent executors and trustees to protect their respective interests.]

"It is otherwise, however, as respects James Marshall, Jr., and if his interests in the stocks illegally pledged to and claimed by the plaintiff bank were definitely ascertained, the master would hold that he could not be permitted to defend as respects his own interest, and avoid his own acts. His property is now in the hands of an assignee, under a voluntary assignment, for the benefit of his creditors, and it cannot be ascertained until his account as executor and trustee has been settled, what interest he had in the estate of James Marshall, deceased, at the time of the transaction stated in the sixth, seventh, and eighth paragraphs of the bill, and whether he had any interest at all.

["For these reasons the master recommends that the plaintiff's bill be dismissed, at the plaintiff's costs."]

The plaintiff excepted, *inter alia,* to the findings of fact and law by the master, inclosed in brackets above. The court below dismissed them, with an opinion in which Ewing, P. J., after commenting on the evidence, said:

"The law of the case on these facts appears to be well settled.

"In Petrie v. Clark, 11 Serg. & R. 377, 14 Am. Dec. 636, Judge Gibson says: 'Where the pawnee knew that the money was obtained for purposes foreign to the executor's duty, the transaction is considered to be collusive.'

"In Colt v. Lasnier, 9 Cow. 342, after a discussion of the English and American cases, the rule of law is laid down as follows: 'It seems to me, therefore, the correct rule both in England and in this state, is that any person receiving from an executor the assets of his testator, knowing that this disposition of them is a violation of his duty, is to be adjudged as conniving with the executor, and that such person is responsible for the property thus received either as a purchaser or a pledgee.'

"In M'Neillie v. Acton, 4 DeG. M. & G. 744, the deceased in his will directed the carrying on of his trade by the executor. It was held that this did not authorize the employment of any of the assets of the estate, not already in the business; and although a general power was given to the executor to mortgage

for debts, and an equitable mortgage had been created for an advance of money, which the creditor was informed and believed to be necessary to carry on the business, held, that the mortgage could not be enforced.

"To the same effect is Devitt v. Kearney, Ir. L. R. 11 Eq. 225.

"The questions involved are fully discussed and decided in Smith v. Ayer, 101 U. S. 326, 25 L. ed. 958, cited by the master, as also in the case of Hoyt v. Sprague, 103 U. S. 620, 26 L. ed. 589, cited by plaintiff's counsel. These two cases, read together, give a full discussion of the questions involved in this case, and the result is clearly adverse to the claim of the complainant to hold this stock as security for its loans to James. Marshall, Jr., as acting executor, under the facts of this case. I am of the opinion that the other executors, who, according to the master's findings, were ignorant of the pledge of these stocks, can properly defend in this case. They represent the *cestuis que trust* who are to be protected from the wrong attempted to be done to the estate. The Farmers' Deposit National Bank has also a right to interpose a defense in their favor.

"If there was nothing more in the case, the proper decree would be for the delivery to the executors of the certificates of stock wrongfully pledged to the plaintiff.

"But under the will of James Marshall, James Marshall, Jr., who pledged these stocks, has at least a contingent interest therein as one of the *cestuis que trust* under the will.

"It seems to us that the plaintiff has an equitable right to be subrogated to whatever rights James Marshall, Jr., may eventually be found to have in these stocks or the proceeds thereof. The case of Prall v. Tilt, 27 N. J. Eq. 393, is authority for this position.

"It is said that James Marshall, Jr., has in a similar manner pledged nearly all, if not all, the large amount of stocks belonging to his father's estate. What interest, if any, he may in fact have in these stocks so pledged cannot be determined in this proceeding. It can only be determined on a final distribution of the assets of the estate, under the decree of the orphans' court. It is possible that in the end the plaintiff may be entitled to be repaid its loans from the proceeds of the stocks. It may turn out that no part of the same will be applicable thereto.

"The executors are entitled to the certificates and the stock

for the purposes of the estate. They must hold the proceeds thereof (or an agreed value thereof), subject to the right of the plaintiff to claim and take the share or interest which the orphans' court on final distribution, may determine as coming to James Marshall, Jr., therefrom. .

"The plaintiff must deliver up the certificates of stock delivered to it to be held by the executors on the condition herein indicated.

"The costs should be paid, one half by the plaintiff, and one half by the executors, except so far as hereinbefore indicated."

MAGEE, J., concurred. WHITE, J., dissented.

A decree was entered in accordance with the master's report and the opinion of the majority of the court.

The assignments of error specified, *inter alia*, the dismissal of the exceptions to the master's findings of fact and conclusions of law, setting them out in full, and to the entry of the decree in the case.

*J. F. Slagle* and *Geo. Shiras, Jr.*, for appellant.—The legal title to stock of a bank passes by the assignment and delivery of the certificate therefor, although there be no transfer upon the books of the bank. Wood's Appeal, 92 Pa. 389, 37 Am. Rep. 694; Leitch v. Wells, 48 N. Y. 585.

A blank power of attorney, though under seal, may be filled in, in conformity with the agreement of the parties, and when so filled up takes effect from original date of delivery. Wood's Appeal, 92 Pa. 379, 37 Am. Rep. 694; Bridgeport Bank v. New York & N. H. R. Co. 30 Conn. 231; Redf. Railways, § 35.

An executor holds under a trust. He is the minister and dispenser of the goods of the dead. He has the same property in the personal effects as the deceased had when living. It is a general rule of law and equity that an executor has an absolute power of disposal over the personal effects of his testator, and they cannot be followed by creditors or legatees into the hands of the purchaser. Wood's Appeal, 92 Pa. 391, 37 Am. Rep. 694; Bayard v. Farmers' & M. Bank, 52 Pa. 235; Petrie v. Clark, 11 Serg. & R. 384, 14 Am. Dec. 636; Wms. Exrs. 932.

Coexecutors are regarded in law as an individual person, and the acts of one of them in respect to administration of the ef-

fects are deemed to be the acts of all, as: when he sells the goods and chattels of the estate his acts binds the others. Wood's Appeal, 92 Pa. 391, 37 Am. Rep. 694; Grace v. Sutton, 5 Watts, 542; Bayard v. Farmers & M. Bank, 52 Pa. 232.

A pledge of property for money advanced at the time depends on all those considerations that would affect an absolute sale under like circumstances. Petrie v. Clark, 11 Serg. & R. 387, 14 Am. Dec. 636.

When executors and trustees are the same persons to transfer the title to property from the executors as such to themselves as trustees, there must be some notorious acts to evidence such transfer. Perry, Tr. § 262; *Ex parte* Dover, 5 Sim. 500; Willmott v. Jenkins, 1 Beav. 401; Hall v. Cushing, 9 Pick. 409; Newcomb v. Williams, 9 Met. 534; Conkey v. Dickinson, 13 Met. 51; Prior v. Talbot, 10 Cush. 1; Miller v. Congdon, 14 Gray, 114; Perkins v. Moore, 16 Ala. 15; Wood's Appeal, 92 Pa. 393, 37 Am. Rep. 694.

It is therefore clear that James Marshall, Jr., had the power to make the transfer, and that it was made in due form.

It is true that everyone is presumed to know the law, and ignorance is no excuse for its violation either in a civil or criminal proceeding. But we submit that this, like every other rule of law, is not to be used for the punishment of the innocent and those who have acted in perfect good faith. The case of dealing with executors is no exception.

In Petrie v. Clark, 11 Serg. & R. 385, 14 Am. Dec. 636, this court said: In case of a collusive transfer, the right of legatees to follow the assets is never claimed at law, for the executor is the owner of the legal title, and may dispose of them by any species of voluntary alienation by which he may dispose of his own. The remedy is invariably in equity. To the same effect are: M'Leod v. Drummond, 14 Ves. Jr. 353; 17 Ves. Jr. 152; Keane v. Robarts, 4 Madd. 332.

Trotter v. Shippen, 2 Pa. St. 358, is a case strongly, in principle, resembling the present one. The court there held, per GIBSON, C. J., that a pledge for a present advancement is not distinguishable from a sale for value. Keane v. Robarts is cited with approval; and also the observation of Sir William Grant, in M'Leod v. Drummond, that "suspicion of fraud must always arise, where a party having a debt due to him by the executor,

takes, in satisfaction of that debt, the assets which he knows belong to the executor only in that character; but where a man is applied to for a loan of money, there is no motive to fraud." In Trotter v. Shippen, Nixon, who held a mortgage as executor of Aspden's estate, credited upon it $1,149.50 due by him to the mortgagor on private account; and it was sustained, because at the time the mortgagor and Nixon were both solvent, and there was no intention to defraud.

In Petrie v. Clark, 11 Serg. & R. 386, 14 Am. Dec. 636, the test was stated to be whether the transaction was tainted with actual fraud.

In Carter v. Manufacturers' Nat. Bank, 71 Me. 448, the facts were that an executor applied for and obtained from a bank a loan of money on his individual note, securing the same by a pledge of assets of the estate. It was shown that the executor stated to the bank authorities, at the time of borrowing the money, that he wanted the money for the use of the estate. He applied the money to his own use. Hence, in point of form, the loan was on the individual note of the executor, and, in point of fact, the money was not used for estate purposes. Yet the court held that as the bank acted in good faith, believing his statement that he intended to use the money for the estate, the pledge was good.

If business is carried on by executors without authority under the will, it may be justified by the consent of parties interested in the estate, and if without consent, it is still optional with the parties interested to require an account of the moneys used in the business with interest, or for profits realized.

Wms. Exrs. 1795; Garrett v. Noble, 6 Sim. 504; Collinson v. Lister, 20 Beav. 356; Poole v. Munday, 103 Mass. 174.

Upon the representation of the acting executor, the plaintiff had the right to assume that his conduct of the business was authorized.

Carter v. Manufacturers' Nat. Bank, 71 Me. 448.

*A. M. Brown* and *D. T. Watson,* for appellees.—Concerning the general law of partnership there can be no doubt. Where no time is fixed for its duration, either partner may dissolve it at his pleasure; and unless there be an express stipulation to the contrary it is dissolved by the death of either party. Gratz v. Bayard, 11 Serg. & R. 46.

Though a partner may, by his will, provide for the continuance of a partnership in which he is interested at the time of his death, yet if it is alleged he has so provided, even only to the extent of rendering liable for subsequent debts his interest in the firm, the authority for the continuance must be clearly made out. If it is claimed that the testator intended to make his general assets liable for the subsequent debts of the firm, this must be proven by the "most clear and unambigous language, demonstrating in the most positive manner" this intent. Burwell v. Cawood, 2 How. 560, 11 L. ed. 378; Smith v. Ayer, 101 U. S. 320, 25 L. ed. 955; Scholefield v. Eichelberger, 7 Pet. 586, 8 L. ed. 793; Gratz v. Bayard, 11 Serg. & R. 46; Laughlin v. Lorenz, 48 Pa. 282, 86 Am. Dec. 592; *Ex parte* Richardson, 3 Madd. 138; Cutbush v. Cutbush, 1 Beav. 184; Travis v. Milne, 9 Hare, 141; Williamson v. Naylor, 3 Younge & C. Exch. 208; *Ex parte* Garland, 10 Ves. Jr. 110; Kirkman v. Booth, 11 Beav. 273, 280; Pitkin v. Pitkin, 7 Conn. 307, 18 Am. Dec. 111; Alsop v. Mather, 8 Conn. 587, 21 Am. Dec. 703; Lucht v. Behrens, 28 Ohio St. 231, 22 Am. Rep. 378; Parsons' Partn. pp. 453, 454; 2 Wms. Exrs. p. 1625.

After the dissolution of the partnership the partners are not the agents of each other, except for the purpose of making good outstanding engagements. They cannot enter into a new contract or engagement for their former partner. They have no authority, either express or implied, for any such purpose, nor does necessity or public convenience require that they should. They become so disconnected in interest that the one cannot by any contract or engagement implicate the credit of the other. Levy v. Cadet, 17 Serg. & R. 129, 17 Am. Dec. 650.

The law is well settled that after the dissolution of a partnership the partners cease to have any power to make a contract in any way binding on each other. The dissolution puts an end to the authority and operates as a revocation of all power to create new contracts. Reppert v. Colvin, 48 Pa. 252.

When the appellant bank dealt with James Marshill, Jr., as an executor of the last will and testament of James Marshall, deceased, it was visited with knowledge of the contents of the will of the decedent, and, therefore, had notice that the executors of said will were not authorized to carry on or use the general assets of the decedent's estate for new contracts and engagements of the firm of James Marshall & Company. Garrard

v. Pittsburgh & C. R. Co. 29 Pa. 158; Wood's Appeal, 92 Pa. 392, 37 Am. Rep. 694; Hill v. Epley, 31 Pa. 336; Tritt v. Colwell, 31 Pa. 233; Bohlen's Estate, 75 Pa. 304; Smith v. Ayer, 101 U. S. 326, 25 L. ed. 958.

In Pennsylvania an executor is emphatically a trustee, having no other interest than in his commissions, and what may be directly given to him by the testator. All funds of the estate in his hands are trust funds, and if loaned by him to others with a knowledge of the facts are trust funds in the hands of the receiver, and whether loaned properly or not must be repaid to the trustee. Abbott v. Reeves, 49 Pa. 495, 88 Am. Dec. 510; Garrard v. Pittsburgh & C. R. Co. 29 Pa. 157; Hill v. Epley, 31 Pa. 336; Tritt v. Colwell, 31 Pa. 235.

Where the executor is a partner in the firm, and as executor assigns stock to secure a debt of the firm, it is a *devastavit* by the executor, and the assignee takes no title. Miller v. Williamson, 5 Md. 219; Prall v. Hamil, 28 N. J. Eq. 66; Wood's Appeal, 92 Pa. 392, 37 Am. Rep. 694; Shaw v. Spencer, 100 Mass. 382, 392, 1 Am. Rep. 115, 97 Am. Dec. 107; Thomasson v. Brown, 43 Ind. 203; Field v. Schieffelin, 7 Johns. Ch. 150, 11 Am. Dec. 441; M'Neillie v. Acton, 4 DeG. M. & M. 744; Devitt v. Kearney, Ir. L. R. 11 Eq. 225.

PER CURIAM:

The opinion of the master in this case is certainly very accurate and learned, and has been followed with a slight modification by the opinions of the learned judges, or a majority of them, of the court below. We, therefore, adopt those opinions. as containing a true exposition of the law of this case.

The decree is affirmed and the appeal is dismissed at the costs. of the appellant.